1
2
3
4
5
6
7
8        IN THE UNITED STATES DISTRICT COURT
9        EASTERN DISTRICT OF CALIFORNIA
10
11   GORDON R. OSBORN,                    CASE NO.  1:21-cv-00842-CDB
12                     Plaintiff,         ORDER GRANTING DEFENDANT'S MOTION
                                          FOR SUMMARY JUDGMENT
13          v.
                                          (Doc. 29)
14   THE PAUL REVERE LIFE INSURANCE
     COMPANY,
15
16                     Defendant.
17

18          Pending before the Court is the motion for summary judgment by Defendant The Paul Revere

19   Life Insurance Company ("Defendant"), the opposition of Plaintiff Gordon R. Osborn ("Plaintiff"), and

20   Defendant's reply.[1]  (Docs. 29-31).  For the reasons set forth herein, Defendant's motion for summary

21   judgment shall be GRANTED.

22   **<u>Factual Background</u>**[2]

23          Plaintiff was an oral and maxillofacial surgeon who opened and owned a business in Bakersfield,

24   California.  (Doc. 29-2, Joint Statement of Undisputed Facts "JSUF" at ¶ 5).  Plaintiff's job duties

25          [1] On June 10, 2021, following the parties' expression of consent to the jurisdiction of a United
26   States magistrate judge, this action was reassigned to the assigned magistrate judge for all purposes
     pursuant to 28 U.S.C. § 636(c)(1).  (Doc. 7).

27          [2] As it must on a motion for summary judgment, the Court sets forth the material facts and draws
     all reasonable inferences in the light most favorable to Plaintiff, the non-moving party.  *See Scott v.*
28   *Harris*, 550 U.S. 372, 387 (2007).

consisted of third molar surgery, reconstructive jaw surgery, and single and multiple extractions of teeth. (Doc. 30-1, Plaintiff's Separate Statement of Material Facts "PSMF" at ¶ 93).  On March 20, 1989, Plaintiff was issued an individual disability insurance ("IDI") policy by Defendant, policy number 0102385715, and a business overhead expense ("BOE") policy, policy number 0102385716.  (Doc. 29-6 at 4, 47; JSUF at ¶ 1).  Plaintiff's IDI and BOE policies begin to pay benefits on the 91st and 31st day of disability, respectively.  (JSUF at ¶ 3).  The IDI policy provides:

> "We will periodically pay a Total Disability benefit during Your Total Disability…This benefit will begin on the Commencement Date.  We will continue to pay it while You remain Totally Disabled.  [] The Paul Revere Life Insurance Company will pay the benefits provided in this Policy for loss due to Injury or Sickness.[3]  The term Total Disability has been given a particular meaning by the California Department of Insurance.  For these policies, it means you are totally disabled when you are rendered unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way.  The policy defines Injury as an '…accidental bodily injury sustained after the Date of Issue and while Your Policy is in force.'  The policy defines sickness as a 'sickness or disease which first manifests itself after the Date of Issue and while Your Policy is in force…'"

*Id*. at ¶ 2 (internal quotations marks omitted).  The BOE policy provides for payment of additional benefits due to a claimant's "Injury" or "Sickness" during a period of "Total Disability" (with those capitalized terms defined identically as defined in the IDI policy):

> "The amount We will pay is equal to the Covered Monthly Expense You actually incur, while Totally Disabled. … This benefit will begin on the Commencement Date.  … Under the BOE policy, Covered Monthly Expense means those fixed, monthly expenses incurred in Your Occupation that are ordinary and necessary in the operation of Your business or profession."

*Id*. at ¶ 4 (internal quotations marks omitted).  Plaintiff's policy benefits, along with premium payments, increased over the years the IDI policy was in force until the promised basic monthly disability benefits totaled $17,400 per month.  (PSMF at ¶ 38).  Under the terms of the IDI policy, because Plaintiff filed his claim after age 65, his maximum benefit period is 24 months.  *Id*. at ¶ 39.

---

[3] Under the policies, "'Total Disability' means that *because of* Injury or Sickness … You are unable to perform the important duties of Your Occupation."  (JSUF Ex. A, Doc. 29-5 at 15; JUSF Ex. B, Doc. 29-5 at 55) (emphasis added).

At some point, Plaintiff was diagnosed with asthma, hypogammaglobulinemia, and hypertension. (JSUF at ¶ 6).  On March 8, 2019, Plaintiff was seen by an allergist/immunologist, Rita Kachru, M.D., for a follow-up and evaluation of his allergic rhinitis, asthma, and hypogammaglobulinemia.  (PSMF at ¶ 44).  Dr. Kachru's impressions were that Plaintiff's asthma and allergic rhinitis were well controlled. (PSMF at ¶ 45; Doc. 30-5 at 54).  Dr. Kachru also reviewed Plaintiff's hypogammaglobulinemia.  *Id.* Dr. Kachru advised Plaintiff to continue taking Singulair, Dulera, Azelastine, and Flonase nasal sprays, check his immune status, and obtain laboratory tests prior to following up in a year or earlier as needed. (PSMF at ¶ 45).

On March 21, 2019, Plaintiff was seen by David Dougherty, M.D., for an annual physical exam. *Id.* at ¶ 46.  Dr. Dougherty assessed Plaintiff with asthma, hypertension, and essential tremor.  (PSMF at ¶ 46; Doc. 30-5 at 64).  Dr. Dougherty noted Plaintiff had an exacerbation of asthma in 2018 but had been doing well since.  (PSMF at ¶ 46).  On December 2, 2019, Plaintiff again saw Dr. Kachru.  *Id.* at ¶ 47.  Dr. Kachru noted Plaintiff had a history of asthma, hypogammaglobulinemia, and chronic cough. (PSMF at ¶ 47; Doc. 30-5 at 69).

On March 5, 2020, Plaintiff again was seen by Dr. Kachru for his annual visit.  (PSMF at ¶ 48; Doc. 29-1, Defendant's Separate Statement of Material Facts "DSMF" at ¶ 7).  As with his examination one year earlier (in March 2019), Dr. Karchu found Plaintiff's allergic rhinitis, asthma, and hypogammaglobulinemia to be well controlled.  (DSMF at ¶ 7).  "[A]t the time of the pandemic," Dr. Karchu told patients who had hypogammaglobulinemia or severe asthma that the Centers for Disease Control and Prevention ("CDC") considered them to be "high risk" and to limit having exposure to anybody who could potentially give them an infection.  (Doc. 30-5 at 114).  Dr. Karchu provided such general instructions orally to patients with hypogammaglobulinemia.  *See id.* at 113-18 ("Now, again, I apologize.  I don't—I didn't write it down.  I didn't write it.  If you look at anybody's chart, you'll see it.  It was—a lot of this was verbal unless they needed documentation saying to stay to limit exposure."). Dr. Karchu observed that "from the pandemic forward, we were very [] particular with our patients with [hypogammaglobulinemia] to '[i]f you can, stay home.  If you can't, limit your exposure to sick people. And if you feel like you can't do it, let me know and I will write you a letter if you need it for your—for your employer.'"  *Id.* at 117.

3

Plaintiff does not recall Dr. Kachru recommending any limitation on his activities or function due to his hypogammaglobulinemia, did not recall discussions with any medical professional about the risk of returning to work in a COVID environment, and no physician ever gave Plaintiff particularized instruction regarding minimizing his COVID risk.  (Doc. 31-4 at 19, 23-24).[4]

On March 12, 2020, Plaintiff again was seen by Dr. Dougherty.  (DSMF at ¶ 8).  Dr. Dougherty found Plaintiff's blood pressure had been good and controlled.  *Id.*  At some point, Dr. Dougherty discussed Plaintiff's high risk should he catch COVID early in the pandemic.  (Doc. 30-5 at 135-36).  The record is unclear whether this conversation took place in March 2020 or August 2020.  *Id.*  Dr. Dougherty generally "gave everyone—I let people make their own decisions," and specifically told Plaintiff "that he was at high risk and his occupation was high risk and he didn't have good lungs." *See* (Doc. 31-4 at 49).[5]

The weekend following his visit with Dr. Dougherty, Plaintiff received information from the American Association of Oral Maxillofacial Surgery that limited practicing to only urgent and emergent procedures and restricted the frequency for which an operation room could be used.  (DSMF at ¶ 9; Doc. 29-6 at 153).  Around this same time, Plaintiff noted the risks of COVID were "mounting."  (Doc. 29-6 at 153).

On March 12 or March 13, 2020, Plaintiff stopped working and on March 16, 2020 (a Monday), Plaintiff went to work and decided to "cancel everybody because I think the risks are too high."  (DSMF at ¶ 9; PSMF at ¶¶ 40, 51; Doc. 29-6 at 153).  At that time, Plaintiff had five employees.  (DSMF at ¶ 30; Doc. 29-4 at ¶ 6).  Plaintiff made arrangements for the managers to work remotely.  (DSMF at ¶ 32; Doc. 29-6 at 108).  Stephanie Craven, an employee of Plaintiff, was responsible for ordering supplies after the pandemic lockdown in March of 2020.  (Doc. 29-6 at 184).  From March 2020 through May 2020, Ms. Craven attempted to purchase protective personal equipment ("PPE") for the office but experienced problems in obtaining PPE.  *Id.* at 185.

[4] Although Plaintiff asserts Dr. Karchu recommended Plaintiff "stop working" on account of his medical diagnoses (PSMF at ¶ 49), Plaintiff's record citations (*e.g.*, excerpts of Dr. Karchu's deposition testimony, *see* Doc. 30-5 at 114) do not support that contention.

[5] Although Plaintiff asserts Dr. Dougherty recommended Plaintiff "stop working" on account of his medical diagnoses (PSMF at ¶ 50), Plaintiff's record citations (*e.g.*, excerpts of Dr. Dougherty's deposition testimony, *see* Doc. 30-5 at 135-36) do not support that contention.

At some point in May 2020, Plaintiff started discussing closing the office.  (DSMF at ¶ 12).  Plaintiff's practice continued to find it difficult to obtain the necessary PPE.  *See* (Doc. 29-6 at 189) ("the reality of the PPE shortage was apparent, that there was a huge shortage, and we were finding it difficult to find the necessary PPE.").  The Occupational Safety and Health Administration ("OSHA") issued guidelines for dental practices that emphasized the risk of aerosolization via routine dental procedures.  (Doc. 30-3 at ¶ 9).  The guidelines explained:

> "The practice of dentistry frequently involves the use of instruments such as dental turbines, micro-motor or rotary hand pieces, ultrasonic scalers, and air-water syringes that create sprays containing droplets of water, saliva, blood, microorganisms, and other body fluids, particulates, and debris, all of which can contribute to the generation of aerosolized droplets and thus the transmission of SARS-COV-2.  Performing or being present for aerosol- generating procedures performed on patients infected with SARS-CoV-2, even if the patient is not experiencing signs and/or symptoms of COVID-19, is a very [high-risk] activity."

(PSMF at ¶ 97).  Higher level PPE such as N95 masks were recommended.  (PSMF at ¶ 98; Doc. 30-3 at ¶ 9).  These supplies were not readily available to dental practices until the late fall of 2020.  (PSMF at ¶¶ 98-99; Doc. 30-3 at ¶ 9).  Plaintiff's practice determined "[t]he plan was to continue to try and find PPE, to see if there was a possibility that we could get what we needed."  *Id*. at 191.

In June 2020, Plaintiff decided to permanently close his practice.  (DSMF at ¶¶ 12-13).  Plaintiff's office was unable to determine when the needed PPE would become available, and Plaintiff would not reopen the office without it.  *See* (JSUF at ¶ 11; Doc. 29-6 at 147) ("[I]f we can't protect the interests of the people we serve, then we're done.").  Plaintiff would have returned to work "absolutely" if he had access to PPE.  (DSMF at ¶ 10; Doc. 29-6 at 151).

Thereafter, Plaintiff laid off most of his staff and attempted to sell his practice.  (DSMF at ¶ 15; Doc. 29-6 at 154, 156-58, 161, 184).  Plaintiff was unable to get out of his lease.  (DSMF at ¶ 33 Doc. 29-4 at ¶ 8).  Plaintiff continued to maintain Ms. Craven and Shelby Harris as employees for "accounts receivable and administrative things."  (DSMF at ¶¶ 30, 34-35; Doc. 29-6 at 158) ("duties included: accounts receivables, making sure patients were transferred to another oral surgeon and transferring their records, accounts payable, answering phones, dismantling the office, Paycheck Protection Program Loan Forgiveness process, UNUM BOE and IDI correspondence, bookkeeping/accounting/tax responsibilities.").  Plaintiff's practice attempted to sell what PPE it possessed.  *See* (Doc. 29-6 at 161)

("If—if there was any, it would have—they would have attempted to sell it to, you know, an

appropriate—you—person who could utilize it.").

In June 2020, Plaintiff listed his house for sale, and moved out of California before the sale was

finalized in November 2020.  (DSMF at ¶ 17; Doc. 29-6 at 164-65).  Plaintiff moved to his ranch in

Colorado, where he currently lives.  (DSMF at ¶ 18).  Plaintiff never renewed his dental license to

practice in Colorado or considered working as an oral surgeon in Colorado.  *Id*. at ¶ 19.

In late July or August 2020, Ms. Craven received PPE and N95 masks but there was no

discussion of reopening the office.  (DSMF at ¶ 16; Doc. 29-6 at 187).  There is no medical reason why

Plaintiff cannot use PPE.  (DSMF at ¶ 27).

On August 8, 2020, Plaintiff experienced a pulmonary embolism while traveling back from

Colorado.  (JSUF at ¶ 20; PSMF at ¶¶ 52-53).  On September 4, 2020, Dr. Michael Brezinsky reviewed

Plaintiff's pulmonary embolism condition.  (PSMF at ¶ 53).  Based on Dr. Brezinsky's assessment,

Defendant determined that Plaintiff's pulmonary embolism was disabling, albeit only for 27 days.  *Id*. at

¶¶ 54, 101.

At some point, Defendant developed guidelines that served as a "framework and

recommendations" for COVID-based disability claims. (PSMF at ¶ 109; Doc. 30-5 at 656-58).  Factors

to be considered include:

> "Prior medical restrictions and limitations outside of the COVID environment.  There are
> medical conditions for which insureds are at potentially higher risk of contracting infectious
> diseases.  If the insured's condition did not or would not medically restrict him/her from
> performing the occupational duties outside of the COVID environment and if the medical status
> has been stable, the reviewer should address whether the insured is restricted from working in the
> COVID environment with the proper use of appropriate PPE…If someone claims to be unable to
> use appropriate PPE because of a medical impairment, then the reviewer must determine whether
> the medical evidence supports such a statement."

(Doc. 30-4 at ¶ 92; Doc. 30-5 at 656-58).  Other key considerations include: (1) exposure to

aerosolization procedures, and (2) close and extended contact with the general public or co-workers.

(Doc. 30-4 at ¶¶ 92-93; Doc. 30-5 at 658).

Separately, Defendant also provided guidance on how to assess a claimant whose claim includes

comorbid conditions.  (PSMF at ¶ 118; Doc. 30-5 at 660-65).  When a claimant has comorbid conditions

and Defendant's medical resources disagree with the conclusions offered by the claimant's treating

6

physicians, a "Medical Analysis Checklist" should be used to ensure that a "whole person analysis of conditions and impairments" is conducted.  (PSMF at ¶ 119; Doc 30-5 at 661-62).

On November 3, 2020, Plaintiff submitted a claim under his IDI policy claiming disability as of March 13, 2020, due to "asthma, hypertension, and status-post saddle [pulmonary embolism]" and stating that he could not be in the "constant [COVID] environment due to his comorbidities [and] could not obtain all necessary personal protective equipment due to shortage."  (JSUF at ¶ 21; PSMF at ¶¶ 55-56).[6]  At the time, Plaintiff had never been tested to determine exposure to COVID-19.  (PSMF at ¶ 110; Doc. 31-1 at 23).  In support of his claim, Plaintiff submitted medical and financial information.  (PSMF at ¶¶ 57-59; DSMF at ¶ 25).  On November 11, 2020, Dr. Dougherty completed an Attending Physician Statement noting he advised Plaintiff "not to work due to COVID risk."  (PSMF at ¶ 57; Doc. 30-5 at 181).

Defendant received Plaintiff's claim and Erin Moore, the Lead Benefit Specialist, was assigned to Plaintiff's case.  (DSMF at ¶ 25; Doc. 29-4 at ¶¶ 2-3).  On November 19, 2020, Ms. Moore had a telephone call with Plaintiff regarding his claim.  (DSMF at ¶ 28, Doc. 29-4 at ¶ 6).  Plaintiff stated he was able to do his daily activities and errands, he just needed to stay COVID-free.  *Id.*

Defendant requested and received medical records from Drs. Dougherty, Karchu, and Brezinsky.  (DSMF at ¶ 25).  Under Ms. Moore's authority, Drs. Joseph Antaki and Gabriel Anders reviewed the available medical records and opined on whether this information supported restrictions and limitations that would preclude Plaintiff from performing his occupational duties.  (Doc. 29-4 at ¶ 5).  In February 2021, Dr. Antaki spoke with Dr. Doughetry regarding Plaintiff's claim.  (PSMF at ¶ 104; DSMF at ¶ 24).

Dr. Antaki determined Plaintiff's pre-existing medical conditions were well controlled.  (DSMF at ¶ 22).  Dr. Antaki opined "[w]hile Plaintiff would be at risk of developing complications if he were to contract Covid-19 and therefore for this reason may choose not to perform his occupational demands, the records do not support that he is medically restricted from doing so in anticipation of contracting Covid-19, a condition the records did not indicate he currently has."  (DSMF at ¶ 22; PSMF at ¶ 78).

---

[6] Prior to March 13, 2020, Plaintiff had worked full time (35-40 hours) for years with asthma and hypertension.  (JSUF at ¶ 6).

Further, Dr. Antaki observed, "[a]lthough Plaintiff had a history of hypogammaglobulinemia, the records did not support that he had previously been restricted due to a risk of exposure to infection, or that he had a medical condition that rendered him incapable of utilizing the appropriate PPE." (DSMF at ¶ 22). Dr. Antaki concluded Plaintiff was not restricted or limited from practicing as an oral surgeon due to injury or sickness, except from August 8 through September 4, 2020, while recovering from his pulmonary embolism. (PSMF at ¶ 102; DSMF at ¶ 22).

Likewise, Dr. Anders determined Plaintiff's pre-existing medical conditions were well controlled. (DSMF at ¶ 23). Dr. Anders found Plaintiff's conditions could put him at an increased risk of complications should he contract COVID. (DSMF at ¶ 23; PSMF at ¶ 82. Dr. Anders noted Plaintiff "was definitely at high risk of contracting COVID" and if Plaintiff was unable to obtain PPE, he should not practice. (PSMF at ¶¶ 83-84).

At some point, Defendant procured Plaintiff's "own description of job requirements," conducted a vocational review, and asked and/or discussed the issue of COVID risks with Drs. Antaki and Anders. Ms. Moore, Dr. Antaki, a clinical representative, and a vocational representative discussed OSHA's COVID Guidelines for Dental Practitioners. (PSMF at ¶¶ 100, 122). The group also discussed how Plaintiff's job requires working within close proximity to patients and may involve aerosol-generating procedures, but also how patients can be screened prior to coming to the office to undergo a procedure and use PPE. (Doc. 29-6 at 34; Doc. 31-4 at 9-11).

Defendant denied Plaintiff's claims for benefits on March 2, 2021. (PSMF at ¶ 123; Doc. 30-5 at 34-40). Plaintiff was informed of his right to appeal Defendant's decision to deny his claims (finding the restrictions and limitations due to his pulmonary embolism would only have been reasonable for a period of 28 days—falling within the elimination period) but Plaintiff chose not to do so. (JSUF at ¶ 26).

**<u>Procedural History</u>**

On or about April 22, 2021, Plaintiff filed a complaint against Defendant in Kern County Superior Court. (Doc. 1 at ¶ 1). Plaintiff raised the following claims against Defendant (1) breach of contract, and (2) breach of the duty of good faith and fair dealing. (Doc. 1-1). On May 25, 2021,

1   Defendant removed this action to this Court.  (Doc. 1).  Defendant filed an answer to the complaint on

2   June 15, 2021.  (Doc. 8).

3          On April 7, 2023, Defendant filed the instant motion for summary judgment.  (Doc. 29).

4   Plaintiff filed an opposition on April 21, 2023.  (Doc. 30).  Within this opposition, Plaintiff attached a

5   declaration from retained expert witness Laura Parker, a licensed Maine Life and Health Insurance

6   Consultant; Maine Life and Health Producer; Maine Property and Casualty Adjuster; and New York

7   Accident and Health Independent Adjuster.  (Doc. 30-4).  On May 1, 2023, Defendant filed a reply to

8   Plaintiff's opposition and objections to Ms. Parker's declaration.  (Docs. 31, 31-2).

9   **<u>Legal Standard</u>**

10          To prevail on a motion for summary judgment, the movant has the burden of demonstrating that

11   there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of

12   law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Washington Mutual Inc.*

13   *v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  A genuine issue of material fact exists if the

14   record contains some probative evidence that a reasonable fact finder would return a verdict for the non-

15   moving party.  *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers,*

16   *Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  In ruling on a motion for summary judgment, the court must

17   view the facts and draw reasonable inferences in the light most favorable to the nonmoving party.  *Scott*,

18   550 U.S. at 378.

19          Once the moving party satisfies its burden, the burden shifts to the non-moving party to show

20   that there are genuine factual issues that properly can be resolved only by a finder of fact.  *Cal.*

21   *Architectural Bldg. Prods. Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1446, 1468 (9th Cir. 1987)

22   (citing *Anderson*, 477 U.S. at 250).  The non-moving party cannot "rest upon the mere allegations or

23   denials of [its] pleading but must instead produce evidence that sets forth specific facts showing that

24   there is a genuine issue for trial."  *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir.

25   2008) (internal citations omitted); Fed. R. Civ. P. 56(c)(1); *Matsushita Elec. Indus. Co. v. Zenith Radio*

26   *Corp.*, 475 U.S. 574, 586 n. 11 (1986).  The non-moving party must "show more than the mere existence

27   of a scintilla of evidence."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing

28   *Anderson*, 477 U.S. at 252); *Addisu v. Fed Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  However,

the non-moving party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute to be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

**Evidentiary Objections**

The parties advance various objections to the evidence submitted in connection with the parties' pleadings.  (Docs. 30-1; 31-1).  Many are garden variety evidentiary objections based on mischaracterization of the evidence, speculation, lack of foundation, hearsay, violation of the best evidence rule, and relevance.  *See generally id*.  Additionally, Defendant objects to the declaration of Ms. Parker on the grounds that the declaration is "replete with improper (1) testimony in which she is simply acting as a 'document-reader' or purports to interpret documents about which she has no firsthand knowledge, (2) medical opinions, and (3) legal opinions."  (Doc. 31-2 at 2).

The Court has considered the parties' various objections and taken into account the foundational source of the information to which either party objects; however, on a motion for summary judgment, the Court is concerned principally with the admissibility of the content – and not the form – of the facts asserted.  *Sandoval v. Cty. Of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) ("[A]t the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents.") (citations omitted).  Where "the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment."  *Id*. (citations omitted); *see Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (holding that the plaintiff's diary could be considered on summary judgment because she could testify consistent with its contents at trial); *Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992) (IRS litigation adviser's affidavit may be considered on summary judgment despite hearsay and best evidence rule objections; the facts underlying the affidavit are of the type that would be admissible as evidence even though the affidavit itself might not be admissible).

In the event the Court finds evidence material to its ruling on Defendant's motion implicates evidence not admissible at the summary judgment stage, the Court will specifically address that evidence below.

**<u>Discussion</u>**

<u>A. Breach of Contract</u>

Plaintiff's breach of contract claim is based on Defendant's refusal to pay benefits under the IDI and BOE policies.  Plaintiff alleges he was entitled to these benefits under the policies because he was unable to work due to his "risk of contracting COVID-19" given his high-risk status and inability to obtain PPE at the commencement of the pandemic.  (Doc. 1-1 at ¶¶ 3-4, 14, 16, and "Second Cause of Action").

Defendant argues neither an injury nor sickness prevented Plaintiff from performing his duties; rather, he elected not to do so based on a supply issue (a lack of PPE).  Defendant notes Plaintiff himself admitted that if had PPE, he "absolutely" would have re-opened his business before he made the decision to permanently close his doors and that there is no medical reason why he cannot use PPE. (DSMF at ¶¶ 10, 27; Doc. 29-6 at 151).  Defendant contends the inability to get supplies is neither an "injury" nor a "sickness" rendering Plaintiff totally disabled and eligible for benefits, but rather, a choice not to work without adequate supplies.  (Doc. 29 at 17).

      1.    Governing Law

Under California law, an insured is totally disabled if he is unable to perform the substantial and material duties of his occupation in the usual and customary way with reasonable continuity.  *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1006 (9th Cir. 2004) (upholding jury instruction based on *Erreca v. W. States Life Ins. Co.*, 19 Cal. 2d 388 (1942)).  "Recovery is not precluded under a total disability provision because the insured is able to perform sporadic tasks or give attention to simple or inconsequential details incident to the conduct of business."  *Erreca*, 19 Cal. 2d at 396.  "Conversely, the insured is not totally disabled if he is physically and mentally capable of performing a substantial portion of the work connected with his employment."  *Id.*  An insured claiming benefits has the burden of proving that he is entitled to coverage under the policy.  A*rgenal v. Reassure*

*Am. Life Ins. Co.*, No. 13-01947-CRB, 2014 WL 1678008, at *5 (N.D. Cal. Apr. 28, 2014) (citations omitted).

"As a general rule, 'disability insurance policies…provide coverage for factual disabilities…and not for legal disabilities.'" *Allmerica Fin. Life Ins. & Annuity Co. v. Llewellyn*, 139 F.3d 664, 666 (9th Cir. 1997) (quoting *Brumer v. National Life of Vermont*, 874 F. Supp. 60, 64 (E.D.N.Y. 1995)).   Factual disabilities are "disabilities due to a sickness or injury," whereas "[a] legal disability includes all circumstances in which the law does not permit a person to engage in his or her profession even though he or she may be physically and mentally able to do so." *Provident Life & Accident Ins. v. Fleischer*, 26 F. Supp. 2d 1220, 1223 (C.D. Cal. 1998); *Goomar v. Centennial Life Ins. Co.*, 855 F. Supp. 319, 326 (S.D. Cal. 1994), aff'd sub nom., 76 F.3d 1059 (9th Cir. 1996) ("Plaintiff's inability to practice his regular occupation [medicine] is due to his license revocation rather than sickness or injury.").   *See Wright v. Paul Revere Life Ins. Co.*, 291 F. Supp. 2d 1104, 1113-14 (C.D. Cal. 2003) (finding the plaintiff had stopped working, not because of injury or sickness, but because of pending legal problems).

Courts have also found there was no factual disability if external circumstances prevented the claimant from working.  *E.g., Dang v. Northwestern Mutual Life Ins. Co.*, 960 F. Supp. 215, 218 (D. Neb. 1997) (as a hepatitis B virus carrier, plaintiff's limitation was not physical or mental in nature but a social disability, and one the policy does not insure against); *Hampton v. Reliance Std. Life Ins. Co.*, 769 F.3d 597, 599-602 (8th Cir. 2014) (plaintiff was not entitled to benefits because an intervening federal regulation disqualified any person with diabetes from operating a commercial motor vehicle); *Cox v. Mid-America Dairymen, Inc.*, 13 F.3d 272, 237 (8th Cir. 1993) (although the claimant had a heart attack and underwent angioplasty, he returned to work and only stopped working because of a plant closure); *Reeser v. Esmark, Inc. Pension Bd.*, 714 F. Supp. 412, 413-14 (S.D. Iowa 1989) (same).

2.     Analysis – IDI Policy

Here, Plaintiff's comorbidities alone did not prevent him from working as an oral surgeon. Indeed, prior to the pandemic, Plaintiff had worked full time (35-40 hours) for years with diagnoses of asthma, hypogammaglobulinemia, and hypertension.  (JSUF at ¶ 6).  It was only six months after the manifestation of an external circumstance – COVID-19 and Plaintiff's inability to obtain PPE – that Plaintiff first asserted (in his November 2020 claim submission to Defendant) his underlying

impediments are totally disabling.  Plaintiff has offered no compelling evidence that his work activity necessarily would have diminished had he returned to work and no evidence he was unable to perform all the regular duties of his occupation on the first day he absented himself from work or thereafter. Thus, Defendant did not breach the contract in determining Plaintiff's asserted total disability was not "because of" a sickness or injury (JSUF Ex. A, Doc. 29-5, at 15 and Ex. B at 55) and was not the result of a factual disability.  *Cf. Harman v. Standard Ins. Co.*, 564 F. Supp. 3d 1187, 1194 (M.D. Fla. 2021) ("In addition to the policy's clear language requiring that a 'sickness or injury' cause the inability to work, disability insurance policies cover factual disabilities. … A factual disability occurs when an illness or injury prevents someone from engaging in his occupation.").

Plaintiff argues that, even if he was not totally disabled prior to the pandemic, an individual cannot perform his occupation if it would be impossible for him to do so without hazarding his health or risking his life.  Moreover, Plaintiff asserts his doctors told him he was risking death should he continue to work.  (Doc. 30 at 30).  Plaintiff argues it is a well-settled principle of insurance law that an individual cannot perform "his occupation if it would be impossible for him to do so without hazarding his health or risking his life."  *Id.* at 27 (quoting *Clarke v. Aetna Life Ins. Co.*, No. 04 Civ. 1440 (RJH), 2009 WL 4259980, at *21 (S.D.N.Y. Dec. 1, 2009) (internal quotations and citation omitted)). According to Plaintiff, the salient question is whether his conditions made it impossible for him to return to his job.

The record demonstrates Plaintiff's comorbidities did not render it impossible for him to continue working.  Notwithstanding Plaintiff's arguments to the contrary, no doctor recommended he stop work.  Dr. Karchu's records contain no restrictions or recommendations to stop working.  (Doc. 29-6 at 109-115).  Dr. Karchu testified that she would have given oral recommendations to her patients with hypogammaglobulinemia to work from home if they could and to follow CDC guidelines but Dr. Karchu did not explicitly tell Plaintiff he could not work.  (Doc. 31-4 at 29).  Nor does the record establish that Dr. Dougherty recommended Plaintiff to stop work.  Likewise, while Dr. Anders recognized Plaintiff "was definitely at high risk of contracting COVID and if Plaintiff was unable to obtain PPE, he should not practice," Dr. Anders did not find it was impossible for Plaintiff to return to work.  (PSMF at ¶¶ 83-84). *Cf. Geiger v. Zurich American Ins. Co.*, 72 F.4th 32, 39-40 (4th Cir. 2023)

(in review of ERISA action, finding substantial evidence supported denial of disability benefits claim in part because doctors did not opine the claimant was unable to work due to alleged disabling condition).

In all events, any temporary lack of PPE did not render it impossible for Plaintiff to return to work. As Defendant notes, there were mitigating steps Plaintiff could have taken to be proactive about working with comorbidities in the presence of COVID-19. *See* (Doc. 29 at 18) (wearing PPE when it was re-stocked, taking temperatures, requiring negative COVID tests from patients").

Importantly, Plaintiff stated he would have returned to work "absolutely" if he had access to PPE. (DSMF at ¶ 10; Doc. 29-6 at 151). Moreover, the record demonstrates Plaintiff chose to not return to work, despite obtaining PPE in July or August. In *Paul Revere Life Insurance Company v. Ward*, the court held "[o]ne cannot claim a factual disability (such as severe depression) is preventing one from practicing law when one voluntarily erects a legal disability (such as withdrawing from the State Bar with charges pending) to the continued practice of law." No. 02cv2235-BEN (WMC), 2005 WL 8173313, at *6 (S.D. Cal. May 19, 2005). Similarly, Plaintiff erected his own barrier to returning to work – his understandable endeavor to obtain PPE. Failing this, Plaintiff attempted to sell his practice, laid off most of his staff, permanently closed his practice, ultimately disposed of PPE, sold his house, moved to Colorado, and did not renew his license. (PSMF at ¶ 110; DSMF at ¶¶ 15, 17-19; Doc. 29-6 at 154, 156-58, 161, 164-65, 184). Indeed, Plaintiff's concession that he would have returned to work had he obtained PPE undermines any argument that the disabling event rendering him unable to work was a qualifying injury or sickness (or that he otherwise suffered from a factual disability). *E.g.*, *Mass. Mut. Life Ins. Co. v. Millstein*, 129 F.3d 688, 690-91 (2d Cir. 1997) ("Millstein does not claim that his condition is such that even if his suspension from the practice of law was lifted, he would still be unable to practice law."); *Paul Revere Life Ins. Co. v. Bavaro*, 957 F. Supp. 444, 449 (S.D.N.Y. 1997) (citing cases denying entitlement to disability benefits where the claimant suffered from an illness prior to the onset of a legal disability, but the illness did not become disabling until after the occurrence of the legal disability).

Separately, Plaintiff claims courts have consistently ruled that where medical prudence requires a cessation of work activity, the insured is disabled and entitled to benefits. (Doc. 30 at 27). To be sure, some courts have refused to allow an administrator to deny benefits for future risks when such a denial

would put the claimant and/or others at risk, unless the policy at issue expressly denies coverage of such future risks.  *See, e.g., Kufner v. Jefferson Pilot Fin. Ins. Co.*, 595 F. Supp. 2d 785, 797 (W.D. Mich. 2009) (finding denial of benefits was arbitrary and capricious because it failed to account for medical evidence of a doctor's risk of relapse into substance abuse).  Further to this, Plaintiff cites several cases in support of his argument that the risk of COVID is a form of disability.  Many of these cases involve the risk of recurrence of a heart attack.  (Doc. 30 at 28-29) (citing *Kearney v. Std. Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999), *Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F. Supp. 2d 546 (W.D. Pa. 2009), *Abel-Malek v. Life Ins. Co. of N. Am.*, 395 F. Supp. 2d 912 (C.D. Cal. 2005)).  Plaintiff primarily relies on the Third Circuit's decision in *Lasser v. Reliance Std. Life Ins. Co.*, 344 F.3d 381 (3d Cir. 2003) in support of his position.  In *Lasser*, the plaintiff was an orthopedic surgeon who suffered from coronary artery disease, which was exacerbated by an incorrectly performed coronary bypass surgery. *Id.* at 381.  Lasser's doctors opined he could not safely perform the material duties of an orthopedic surgeon because of his heart condition, or at least that he could not do so without exposing himself to a high degree of risk.  *See, e.g., Abel-Malek*, 395 F. Supp. 2d at 916 ("The Third Circuit has established that a plaintiff's decision to work at all, in the face of an increased risk to his health, should not defeat a finding of disability.").

The Court finds *Lasser* is distinguishable from this action.  In *Lasser*, the material duties of the plaintiff's job caused a sufficiently high risk of future harm so as to render him disabled.  The plaintiff received recommendations from multiple medical professionals not to return to his practice.  Additionally, the work itself threatened the plaintiff's health, there was nothing he could do to meet the occupational requirements of his position without risk, and, hence, he was deemed disabled.

In contrast, Plaintiff's performance of his occupational duties alone did not create a risk of future harm.  Instead, Plaintiff only posits a risk of harm due to a temporary shortage of PPE.  While Plaintiff's treating and examining physicians highlighted the risks of COVID, none explicitly recommended Plaintiff discontinue his practice.  Unlike the plaintiffs with heart conditions in which the mitigating step was to stop working, here, Plaintiff could have chosen to mitigate his risk and still performed his material duties.  *Cf. Stanford v. Cont'l Cas. Co.*, 514 F.3d 354, 358 (4th Cir. 2008) ("the heart-attack prone doctor has no such choice.").

1    Accordingly, Plaintiff is not entitled to benefits under the IDI policy because his actions and

2    decisions, and not his comorbidities, made it "impossible" for him to return to work.

3    3.    Analysis – BOE Policy

4    Defendant also asserts Plaintiff is not entitled to business overhead expenses because his

5    business was no longer in operation during the period for which Plaintiff seeks benefits.  (Doc. 29 at 18).

6    Specifically, Defendant argues Plaintiff was not engaging in the operation of his business since March

7    12, 2020, and thus, did not incur expenses in the operation of his business.  *Id*. at 18-21.  Plaintiff

8    counters that the trier of fact should determine which expenses were "necessary in the operation of his

9    business" and "when certain expenses, such as payroll, rent, and certain utilities ceased being 'necessary

10   in the operation of his business.'"  (Doc. 30 at 30-31).  Further, Plaintiff asserts Defendant "admitted

11   that it never completed any analysis of [Plaintiff's] documents that he submitted in support of his BOE

12   claim."  *Id*.

13   The BOE policy provides coverage for any "Covered Monthly Expense," which "means those

14   fixed monthly expenses incurred in [Plaintiff's] Occupation that are ordinary and necessary *in the*

15   *operation of* [Plaintiff's] business or profession."  (JSUF at ¶ 4) (emphasis added).  Under California

16   law, "interpretation of an insurance policy is a question of law that is decided under settled rules of

17   contract interpretation."  *State v. Continental Ins. Co.*, 55 Cal. 4th 186, 195 (2012).  "While insurance

18   contracts may have special features, they are still contracts to which the ordinary rules of contractual

19   interpretation apply."  *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1264 (1992).  "The fundamental

20   goal of contractual interpretation is to give effect to the mutual intention of the parties."  *Id*.  "Such

21   intent is to be inferred, if possible, solely from the written provisions of the contract."  *AIU Ins. Co. v.*

22   *Super. Ct.*, 51 Cal. 3d 807, 822 (1990).  "If contractual language is clear and explicit, it governs."  *Bank*

23   *of the West*, 2 Cal. 4th at 1264.  "The 'clear and explicit' meaning of these provisions, interpreted in

24   their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning

25   is given to them by usage,' controls judicial interpretation."  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th

26   1, 18 (1995) (quoting Cal. Civ. Code § 1644).

27   The language is clear that the BOE policy only covers expenses that are "ordinary" and

28   "necessary" "in the operation of" Plaintiff's business.  Expenses incurred after the close of Plaintiff's

1    practice are not recoverable as necessary to the "operation" of his profession.  *See Wilson v. Monarch*,

2    971 F.2d 312, 313 (9th Cir. 1992) (costs incurred by dentist after he sold his practice were not expenses

3    relating to the "running" of his office).  Here, Plaintiff stopped treating patients on March 12, 2020, and

4    decided to permanently close his office in June 2020.  (DSMF at ¶¶ 12-13).  *See Martin v. Berkshire Life*

5    *Ins. Co. of America*, No. 20-CV-10428 (JMF), 2023 WL 1368239, at *2 (S.D.N.Y. Jan. 31, 2023) (even

6    where business was not formally dissolved, expenses incurred after plaintiff conceded he had ceased

7    providing medical care to patients were not "necessary" to the "operation" of the business) (citing

8    *Wilson*, 971 F.2d at 313).  Plaintiff laid off most of his staff and kept two employees on payroll to assist

9    in closing the practice.  *Wilson*, 971 F.2d at 313 (the mere collection of accounts receivable does not

10   constitute running an office or business).  Plaintiff did not incur expenses in the operation of his business

11   and his claimed expenses regarding the "winding down" of the business was not covered under the terms

12   of the policy.  *Chenvert v. Paul Revere Life Ins. Co.*, No. 03-0330-SLR, 2004 WL 1739718, at *1-2, 4

13   (D. Del. Aug. 2, 2004) ("The key word is 'operation', meaning ongoing. When Chenvert ceased

14   operation of the dental practice, he no longer incurred expenses covered under the policy.").

15         Accordingly, there is no genuine issue of material fact as to Plaintiff's claim for breach of the

16   IDI and BOE policies and summary judgment is warranted in favor of Defendant on Plaintiff's claim.

17   B. Breach of the Covenant of Good Faith and Fair Dealing

18         Plaintiff's claim for breach of the covenant of good faith and fair dealing is based on Defendant's

19   unreasonable failure to pay benefits, misrepresentations concerning the underlying policies, failure to

20   investigate, and failure to deal with Plaintiff in good faith.  (Doc. 1-1 at ¶ 24 and "First Cause of

21   Action").

22         Defendant argues it is entitled to summary judgment on Plaintiff's claim because it reasonably

23   concluded Plaintiff sought benefits due to a "non-medical" reason and not for a factual disability, that

24   doctors comprehensively considered the COVID-related implications of returning to work, and that it

25   otherwise acted in good faith in fully investigating Plaintiff's claim.  (Docs. 29 at 23, 31 at 15-16).

26   Plaintiff challenges this argument and asserts, to the contrary, that Defendant, in denying Plaintiff's

27   claim, failed to consider COVID, his risk of disability, and the complications, including death, should he

28   contract COVID-19, at his age and with his comorbidities.  (Doc. 30 at 32-34).

1       1.       Governing Law

"The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing." *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720 (2007). "In order to establish a breach of the implied covenant of good faith and fair dealing under California law, a plaintiff must show: (1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001) (citing *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (1990)); *Leung v. Unum Life Ins. Co. of Am.*, No. 22-cv-0767 W (JLB), 2023 WL 7351581, at *12 (S.D. Cal. Nov. 6, 2023) (same). This does not obligate an insurance company to pay every claim an insured makes. *Wilson*, 42 Cal. 4th at 720. The mere fact that an insurer withholds policy benefits that are ultimately determined to be owed does not establish a breach of the implied covenant of good faith and fair dealing. *See Chateau Chamberay Homeowners Assn. v. Associated Int'l. Ins. Co.*, 90 Cal. App. 4th 335, 347 (2001); *Maynard v. State Farm Mut. Auto. Ins. Co.*, 499 F. Supp. 2d 1154, 1160 (C.D. Cal. 2007). Instead, "[t]he key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable." *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002) (citation omitted).

While the reasonableness of an insurer's decision is generally a question of fact, "a court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability." *Lunsford v. Am. Guarantee & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994) (citation omitted). "The genuine issue rule in the context of bad faith claims allows a district court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law." *Amadeo*, 290 F.3d at 1161.

The genuine issue rule is evaluated under an objective standard and "[i]f conduct of the insurer in denying coverage was objectively reasonable, its subjective intent is irrelevant." *CalFarm Ins. v. Krusiewicz*, 131 Cal. App. 4th 273, 287 (2005). Under California law, it is not unreasonable for an insurer to "give its own interests consideration equal to that it gives the interests of its insured," *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292 (2000), or "to resolve good faith doubts about the claim

against the claimant." *Phelps v. Provident Life & Acc. Ins. Co.*, 60 F. Supp. 2d 1014, 1022 (C.D. Cal. 1999).  Conduct that has been found to be unreasonable includes: (1) failing to thoroughly investigate the foundation for the denial of benefits, *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 818-819 (1979); (2) ignoring, or failing to obtain readily available evidence that supports coverage, *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1624 (1996); and (3) unreasonably interpreting the policy language to effectuate a denial, *Amadeo*, 290 F.3d at 1162-63.

    2.  Analysis

    Because the Court concludes Plaintiff was not entitled to coverage under the policies, his separate claim that Defendant breached the covenant of good faith and fair dealing in handling his claim is "necessarily foreclosed." *Provident Life & Accident Ins. Co. v. Fleischer*, 18 Fed. Appx. 554, 556 (9th Cir. 2001) (citing *Waller v. Truck Ins. Exchange, Inc*., 11 Cal. 4th 1, 36 (1995) (no liability for bad faith breach of an insurance contract where the insurer is not contractually liable)).

    Even assuming Plaintiff was erroneously denied benefits, he has failed to demonstrate the existence of a genuine issue of fact as to whether Defendant acted in bad faith.  The record demonstrates Defendant considered Plaintiff's underlying conditions, age, and his occupational duties in a COVID environment.  Dr. Antaki reviewed Plaintiff's medical record, and underlying conditions, spoke with Dr. Dougherty, reviewed Plaintiff's occupational duties, and considered the possible complications to Plaintiff if he contracted COVID, as well as Plaintiff's ability to wear PPE.  (PSMF at ¶¶ 78, 102; DSMF at ¶ 22).  Dr. Anders also reviewed Plaintiff's medical records and underlying conditions and considered the possible complications to Plaintiff if he contracted COVID.  (PSMF at ¶¶ 82-84; DSMF at ¶ 23).  Further, the record demonstrates Defendant considered how COVID impacted Plaintiff's job duties and the opinions of Plaintiff's treating physicians.  (PSMF at ¶¶ 100, 122; Doc. 29-6 at 34; Doc. 31-4 at 9-11).

    Plaintiff asserts Defendant failed to thoroughly investigate his claim by "failing to diligently seek out information in support of payment of the claim."  (Doc. 30 at 33).  Plaintiff also argues Defendant "failed to seek out an independent medical examination when it could have exercised that option to ensure [Plaintiff's] interests were placed at least equally to its own."  *Id*.

"While certain actions that an insurer may have failed to take are important in analyzing its overall handling, a mere recitation of actions that an insurer should have taken is not dispositive. Indeed, if this were the case, then most insureds could easily claim bad faith." *Cardiner v. Provident Life & Accident Ins. Co.*, 158 F. Supp. 2d 1088, 1105 (C.D. Cal. 2001). "That a defendant does not exhaust all possible tests is not dispositive." *Id.* (citing *Phelps v. Provident Life and Accident Ins. Co.*, 60 F. Supp. 2d 1014, 1023 (C.D. Cal. 1999)).

Once an insurer determines that a genuine dispute over coverage exists, it is under no further duty to investigate the claim. *Allstate Ins. Co. v. Madan*, 889 F. Supp. 374, 380 (C.D. Cal. 1995). "If the insurance company's conclusion is not so unreasonable as to be a mere pretext for further investigation, the insurer is not liable for bad faith based on its conduct in the investigation." *Id.* (citing *Brinderson-Newberg v. Pacific Erectors*, 971 F.2d 272, 283 (9th Cir. 1992)).

As recounted above, Defendant's investigation provided numerous genuine disputes as to coverage. An insurer's investigation need only be reasonable, not perfect. *Lee v. First National Ins. Co.*, No. CV 09-06264 MMM (CWx), 2010 WL 11549637, at *19 (C.D. Cal. Dec. 22, 2010)) (citing *Roberts v. State Farm Mut. Auto. Ins. Co.*, 61 Fed. Appx. 587, 591-92 (10th Cir. 2003)). While Defendant could have done more to investigate Plaintiff's claim, that is not what the law requires. *See Wilson*, 42 Cal. 4th at 722 ("In some cases, review of the insured's submitted medical records might reveal an indisputably reasonable basis to deny the claim without further investigation."); *see also Othman v. Globe Indem. Co.*, 759 F.2d 1458, 1464-65 (9th Cir. 1985) ("Although in hindsight we may perhaps think of avenues not fully explored … we cannot say that [the insurer] failed to investigate the claim thoroughly or investigated in a manner that indicated its goal was to secure facts to deny coverage"), overruled on other grounds, *Bryant v. Ford Motor Co.*, 844 F.2d 602 (9th Cir. 1987).

Plaintiff also asserts Defendant's bad faith is manifest in its failure to follow its internal procedures as outlined in its claim manuals. (Doc. 30 at 33). However, as Plaintiff concedes, the claims manual provides "guidance" to Defendants' employees with respect to assessing COVID-related disability claims (*id.* at 20) and serves as a "framework and recommendations" of what reviewers consider when assessing restrictions relating to COVID exposure. (Doc. 30-5 at 656-58). Plaintiff advances no evidence that failure to fully follow such guidelines and recommendations establishes bad

faith on the part of an insurer. *E.g., Spradlin v. Geico Indem. Co.*, No. 2:18-cv-10299-SVW-KES, 2019 WL 6481304, at *23 (C.D. Cal. Aug. 1, 2019); A. Windt, 2 Insurance Claims and Disputes § 9:26 & n. 41 (6th ed.) (the relevant standard is whether an insured's decision to withhold benefits was without proper cause—not whether the insurer complied in all respects with its procedural practices in rendering such a decision).

In any event, the record demonstrates that, in Plaintiff's case, Defendant did not materially fail to follow its "internal procedures" as outlined in its claim manuals. Plaintiff's claims file contains a Medical Analysis Checklist in which the listed sections (Diagnosis/Syndrome/Condition, Physician/Provider, Date last seen, Restrictions on functioning per physician/provider, and Assessment) are completed. (Doc. 31 at 23; Doc. 31-4 at 6-7). Lead Benefit Specialist Erin Moore, Dr. Antaki, a clinical representative, and a vocational representative together discussed "Covid Guidance for Dental Practitioners" published from OSHA. (Doc. 31-4 at 9-10). More specifically, the reviewers considered and documented how Plaintiff's job "requires working within close proximity to patients and may involve aerosol generating procedures," but also how patients can be screened prior to coming to the office for procedures and prior to the procedure and that appropriate PPE should be used. *Id.*

Accordingly, there is no genuine dispute of material fact here; the evidence presented—including that by Plaintiff—shows that Defendant's investigation was reasonable, fair, and thorough. Thus, summary judgment is warranted in favor of Defendant on Plaintiff's claim.

C. Punitive Damages

Defendant also moves for summary judgment on Plaintiff's demand for punitive damages. (Doc. 29 at 24-25). Although "[t]he same evidence is relevant both to the finding of bad faith and the imposition of punitive damages…the conduct required to award punitive damages for the tortious breach of contract is of a different dimension than that required to find bad faith." *Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 890 (2000), as modified on denial of reh'g (Mar. 29, 2000) (citing *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1286 (1994)) (modifications omitted). "[T]he evidence in support of the award of punitive damages must satisfy a distinct and far more stringent standard." *Id.*

In California, punitive damages against a corporation are available if there is "clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, [to the plaintiff in addition to the actual damages." Cal. Civ. Code § 3294(a). "With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." Cal. Civ. Code § 3294(b). "California courts have noted that this includes conduct that is 'so vile, base, contemptible, miserable, wretched or loathsome that is [*sic*] would be looked down upon and despised by ordinary decent people,' and conduct 'conceived in a spirit of mischief or with criminal indifference towards to obligations owed to others.'" *Jue v. Unum Grp.*, No. 19-cv-08299-WHO, 2021 WL 427640, at *14 (N.D. Cal. Feb. 8, 2021) (internal citations omitted).

"This higher clear and convincing evidentiary standard applies at every stage of the litigation process, including summary adjudication," and "thus, a plaintiff who is not able to survive summary judgment on an insurance bad faith claim[ ] is also unable to survive summary judgment on a related claim for punitive damages." *Adams v. Allstate Ins. Co.,* 187 F. Supp. 2d 1219, 1231 (C.D. Cal. 2002); *see Anderson v. State Farm Mut. Auto. Ins. Co.*, No. 2:06-cv-2843-JAM-KJM, 2008 WL 2441086, at *9 (E.D. Cal. June 13, 2008) (granting summary judgment in the defendant insurer's favor on plaintiff's punitive damages claim after concluding that plaintiff's bad faith claim failed due to a genuine dispute as to the amount of insurance benefits owed).

Here, Plaintiff largely repeats the same arguments that this Court rejected in connection with his bad faith claim. (Doc. 30 at 36-37). Because the Court finds judgment should be granted on Plaintiff's bad faith claim, Plaintiff's request for punitive damages also fails. *See Lincoln Benefit Life Co. v. Fundament*, No. 8:18-cv-00260-DOC-JDE, 2019 WL 1199025, at *7 (C.D. Cal. Mar. 12, 2019) ("viewing the facts in the light most favorable to [the insured], [the insurer] acted reasonably in investigating the claim … . No jury could conclude that [the insured] acted with oppression, fraud, or malice.").

/ / /

/ / /

**Conclusion and Order**

For the reasons set forth above, IT IS HEREBY ORDERED:

1. Defendant's motion for summary judgment (Doc. 29) is GRANTED on all claims;

2. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   **March 8, 2024**

UNITED STATES MAGISTRATE JUDGE